Melick *v.* Cross.

FRANCES A. MELICK

*v.*

ABRAM C. CROSS.

[Filed January 11th, 1902.]

1. Where a contract for the sale of land with warranty deed made no reference to certain springs thereon, and it afterwards developed that the water from springs was owned by third parties, under reservations unknown to both parties at time of the sale, superior to the vendor's title; that the land was subject to an easement right to pipe away the water from the springs, and that the water right and easement lessened the vendee's enjoyment of the property in the manner contemplated by the contract—semble, they constituted a substantial defect in the title, giving the vendee the right to abandon the contract.

2. Under a contract for the sale and conveyance of land with warranty deed, a substantial defect in the title to the land, affecting only a small portion thereof, and not depriving the vendee of the enjoyment of the residue in the manner contemplated by the contract, may be waived by the vendee as an objection to the title or to carrying out the contract.

3. Where a defect in the title to land contracted to be sold and conveyed with warranty deed is subject to a waiver by the vendee, and is in fact waived, the contract continues in force, subject to compensation for the defect.

4. In a suit by a vendee for specific performance of a contract for sale of land, the vendee testified that he remained in possession after the time limit of the contract had expired under a promise by the vendor to obtain the release of certain water reservations on the land. The vendor testified that he made no such promise, and that he insisted that the contract was

Melick v. Cross.

forfeited by expiration of the time limit. The evidence showed a waiver by the vendee of the defect. The vendor's testimony was corroborated by all the facts in the case, while the vendee's was inconsistent with the facts, and had been shaken as to other matters relating to the water rights.—*Held*, that the vendee was not entitled to a conveyance free of the easement, or a return of the purchase-money, but was entitled to specific performance, with compensation.

5. The vendee insisted that the vendor should obtain a release of the water reservations, but made no tender of the balance due and no demand for rescission, while the vendor, although insisting on the forfeiture, told the vendee that he could have the land if he would buy it before someone else did, and made no demand for possession for four months after expiration of the time limit.—*Held*, that the vendor was entitled to specific performance, under a cross-bill, with compensation to the vendee for the defect.

6. The court, having obtained jurisdiction of the cause, will settle the whole controversy and ascertain what compensation was proper for the defect in the title.

On bill for specific performance. Heard on bill, answer and cross-bill, replication and proofs.

*Mr. Willard W. Cutler,* for the complainant.

*Mr. Mahlon Pitney* and *Mr. Edward M. Colie,* for the defendant.

EMERY, V. C.

This case presents for decision several questions arising under the jurisdiction for the specific performance of contracts, which is invoked on behalf of both vendor and vendee, some of the questions being new in our courts. And as one of the questions in the case relates to the effect of the bill and cross-bill filed by the parties upon their respective *status* and claims prior to the suit, the material facts as they existed prior to the filing of the bill should be first stated. On June 30th, 1897, a written agreement was executed between the defendant, Cross, and John E. Melick, the complainant's husband, for the sale by Cross to Melick of a tract of land containing about thirteen acres on Speedwell lake, near Morristown, for the sum of $15,000. The tract adjoins lands belonging to the estate of A. W. Cutler. Two of Melick's notes, one for $500, payable August 1st, 1897, and one

for $1,500, payable September 13th, 1897, were delivered on account of the purchase-money. These notes were secured by collaterals in railroad bonds and notes of third parties for $2,000 and they were paid at maturity. The contract provided that on the payment of the notes the vendee might enter into possession for the purpose of opening and grading streets, building railroad and otherwise developing the property, as in the judgment of Cross and Melick would best open up the property, and that then lots and plots of land should be offered for sale. The proceeds of these sales were to be paid to Cross until $6,000 should have been paid on account of the purchase, and then Cross and wife were to execute a warranty deed for the property to Melick, or his nominee, who should give a purchase-money bond and mortgage for $9,000, payable in three years from the date of the deed, with interest at five per cent. As to the interest and charges, it was provided that interest should be paid from September 15th, 1897, on so much of the $13,000 as remained unpaid, until it was reduced to $9,000, and that the vendee should pay the taxes for the year 1897 and the following years. The contract also contained the following provisions, relating to the failure of the vendee to perform the agreement:

"In case any default in the payment of either of the notes, the collateral security held with them shall be forever forfeited and become the property of A. L. Cross, his heirs or assigns, absolutely. * * * It is also hereby further agreed that in case there shall not be a sufficient number of lots or plots sold to reduce the said balance to $9,000 within two years from the date hereof, then and in that event said Melick shall procure said needed funds elsewhere, as that shall be the limit of time for closing up said sale and purchase. * * * Upon the failure to perform this agreement the said J. E. Melick shall forfeit all payments he may have made prior to the delivery of the deed and the property shall belong to said A. L. Cross, his heirs and assigns, as fully as if this agreement had never been made. And said Melick shall remove any and all improvements he may have made for railroad purposes thereon."

The agreement contained no other provision by way of penalty or liquidated damages for the breach of the contract by either party, and it was declared by them to be binding on their respective heirs or assigns. The securities deposited as collateral for the notes belonged to complainant, for whom, as is admitted

by the bill and answer, and as is proved by complainant and her husband, the latter was acting in making the contract as well as in his subsequent action under it. The notes were paid by Melick when they came due, with money advanced by a Mr. Pidcock, upon the securities, and on August 2d, 1897, Melick executed an assignment, in writing, to Pidcock of the written contract of sale with Cross and designated Pidcock as the person to whom the deed should be executed. On November 24th, 1897, and after payment of the second note, Pidcock executed an assignment of the contract of sale to complainant and designated her as the person to whom the deed should be executed. Neither of the assignments contained any express assumption by the assignees of any obligation under the contract of the original vendees for payment of the balance of the purchase-money. Upon the payment of the two notes, Melick entered into possession of the tract of land, and during the winter of 1897–1898 conducted negotiations for the sale of a portion of the tract to the Speedwell Lake Railroad Company, which had laid out its route across the land. Subsequently, and in the spring of 1898, condemnation proceedings were taken which resulted in the award of about one thousand four hundred dollars for land and damages. Cross, Mrs. Melick and her husband were parties to these proceedings, and Cross says this was his first information that complainant had any interest in the contract. The award was paid to Cross, he realizing about one thousand and fifty dollars, after payment of expenses of the condemnation. In the spring of 1898 the tract was laid out in streets and building lots by Melick, and attempts to sell the lots by public auction and private sale were made, but without success. Previous to the limit of time fixed for closing up the contract (June 30th, 1899) only one lot had been sold, and the deed for this had not been delivered, nor the purchase-money paid. Melick had not paid all of the taxes on the lands after entering into possession, and Cross had been obliged to pay taxes in order to prevent a sale of the lands. Melick had also defaulted in the payment of interest as agreed, having paid only $25 on that account from the time of entering into possession, and that was for interest on notes given in extension of time for interest payments. Dur-

ing the summer of 1898, Melick used part of the premises as a summer picnic resort, and up to the spring of 1899 also made efforts to sell the property in bulk for a residence tract. In January, 1899, he wrote Cross that the lot sales, either auction or private, or sale for gentleman's place, would not work, and suggested a sale of a portion of the tract to another railroad company, in which he (Melick) seems to have been interested. On February 13th, 1899, he wrote Cross that all the money he could get for Cross must come from the lot, and that he would try to get a new railroad company to take part of the land, and that a pleasure resort company would be formed to take the balance of the property, if the new railroad should go through. This letter enclosed a new note to renew a previous note given for interest. No other communication seems to have taken place between Cross and Melick until June 22d, 1899, eight days previous to the time limited for closing the contract, when Melick wrote the following letter:

"6-22-99.

*"Mr. A. L. Cross:*

"DEAR SIR—I am just advised that the people I have been working with all winter to get the railroad built from end of Rockaway through Morristown to Little Falls on the Erie have just sold one R. R. that recently finished and expect to close out another property this week and that my project is the next will take up as is best railroad project for distance is on foot now that they know of so hope soon to be in shape to close out the rest of the 13 ac. lot. I have advertised a sale for July 4th and hope to make sale of several lots. Mrs. Evans is ready to pay her $385 for the 50 x 100 in hollow at corner of Burnham rest she worked out with team making streets, also another lot 35 x 90 about behind it for $175, so if you can sell few more can raise up a payment. I had about sold the site on the back low lots along Cutler's for a woolen mill when in making search find Cutlers have reserved all the springs and water rights on the lot with right to come pipe it out. This knocked over the sale and lost a chance to get about $5,000, there besides believe would ———— been chance to sell lots to folks who would worked in mill, was to employ 200 hands and then the corner out by Lake road bridge had about sold to a Steam Laundry but that spring is out too so I went to Mr. Pitney to get right to take water from lake and would not sell or give away a bit of water. And Cutlers ask $10,000 for the springs, so only thing I can see is to get R. R. to help out with it and sell if can in lots now as Cutler and Burnham are cutting a new street through and hold there lots high. I will see you soon as know when R. R. is ready to start.

"Yours truly,

"J. E. MELICK.

"The lots will sell with promise that sell at least 10 at 400 or over."

Melick *v.* Cross.

Previous to the receipt of this letter Cross had no knowledge or information as to Melick's attempted sale of lots along the Cutler line, referred to in the letter, or of the failure of the sale by reason of a water reservation, nor did he, up to that time, have any knowledge of a water reservation in favor of the Cutler estate. The letter, it will be observed, not only did not make any suggestion that the reservation, or supposed reservation, would, or might, be considered a ground for abandoning the contract, delivering possession and a return of the deposit, but, on the contrary, notified the vendor of a sale proposed to be made on July 4th—after the time limit for closing the contract—proposed to carry out a sale previously agreed on, and also suggested a sale to the railroad company and a future sale of the property in lots as the only thing to do. Apparently, also, the time when the railroad company was to start would not arrive until after the expiration of the contract. This letter requested no reply from the vendor as to any of the matters, nor did it refer to the approaching limit of the contract referred to. This latter omission was, I think, intentional, and, in connection with the previous letters and conduct of the vendee as to raising money to carry out the sale, the vendor was fairly entitled to consider the letter as a notification that the vendee would not be able to raise the money to carry out the contract by the limited time, and as a proposal to go on with the contract after that time. Cross made no reply to this letter from Melick, nor did either vendor or vendee tender themselves ready, on the day fixed, either for the delivery or receipt of the deed or the settlement of the balance of the purchase-money. At the expiration of the time fixed by the contract the vendee still continued in possession, without offering to surrender, and the vendor, on the other hand, did not then, or for several months, make any demand for possession. Cross says that after Melick's letter, on June 23d, 1899, no further communication of any kind took place between the parties until July 12th, 1899, when he sent Melick the following letter:

"July 12, 1899.
"I have been expecting to hear from you for some days, but no word has come. Our agreement has expired by its express terms, and as I am anxious to dispose of the property, shall now see what I can do elsewhere."

Melick *v.* Cross.

Cross further says that about the 20th of July he met Melick, by accident, in Newark, and that

"Melick then asked me what I was going to do about the water right, to which I replied I was not going to do anything; that I did not consider he had any claim there whatever, and that his contract had expired by limitation."

Melick says the interview took place before the 1st of July, and gives an entirely different account of it. He says that, not receiving an answer to his letter of June 22d, he went to see Cross about a week before the expiration of the contract, and asked him what he was going to do about the reservation, and Cross gave him to understand that he would see about it, and they arranged to leave open the delivery of the deed until after the season was over, and that, during the season, Melick should continue to run the property as a pleasure-ground. The account given by these two witnesses as to the next and only other interview, which took place early in September, is of service, in connection with other circumstances, in deciding which one gives the true account of the time or substance of the first interview. At this second interview two other persons were present, Mr. Mills, Melick's attorney, and a Mrs. Evans (referred to in the letter of June 22d), who had bought one of the lots from Melick previous to July 1st, 1899, and desired to complete the purchase and get her deed. Mrs. Evans was not called as a witness. Cross' statement is that Melick then called his attention to an outstanding encumbrance, by way of mortgage to Stephen H. Condit, a former owner of the property, and to the water-right reservation, and asked what he proposed to do about it. Cross said that he had never heard of the mortgage, and that it seemed to have merged in the title which Condit afterwards took, and as to the water right, he did not propose to do anything, as he did not consider that Melick had any rights in the property; that he had forfeited it by the terms of his agreement. As to a conveyance to Mrs. Evans, Cross, as he says, declined to do anything, so far as Melick was concerned, on account of the old contract, but, in order that Mrs. Evans might not lose her money, he would make an independent agreement with her and convey the two lots pur-

chased by her, but Melick would have no interest in the matter, and that he did make the conveyance and received $400 from her for the purchase-price of the lots.  Cross further says:

"I told Melick that if he could make any disposition of the property before I did, I was ready to carry out the contract, but I should not hold myself liable under it any longer.  I told him I was going to sell it, but if he was ready to buy it before I sold others, I was willing to make the conveyance,"

and that Melick, at that interview, said he was ready if the encumbrances, as he called them, were cleared up, but didn't show any money.  On cross-examination, Cross again reiterates that, at that interview, he refused to have anything to do under the old agreement, and that he considered that it had become null and void, by its express terms, and adds, "I intended it so when I drew it."

Melick's account of this interview in September is that he then proposed to Cross to give the deed to Mrs. Evans and that he (Melick) would pay him the balance of the money if Cross would straighten this matter out, and that Cross absolutely refused to do anything—

"he said I had lost all my rights but he would fix Mrs. Evans up.  I said I was ready to pay the balance the agreement called for, to which he said he would not entertain anything from me at all."

Mr. Mills, a young man who was present with Melick as his attorney, gives an indistinct account of the interview, but says in substance that Mrs. Evans wanted a deed for a lot which Mr. Cross would not give for awhile, and that finally the question arose as to the title to the property, Melick contending that there was some encumbrance on the property, which he would like taken off, and Cross said there was none, that there was a merger, and witness thought there was not.  Cross finally agreed to give Mrs. Evans a deed, and then there was more talk about the encumbrance on the whole lot, and Cross suggested that Melick try to buy it himself from the Cutler estate; that he could get it cheaper than Cross, who didn't want to have his name mentioned.  He further says that Melick was to have a

Melick *v.* Cross.

clear deed and Cross was going to get it, if possible, and if it didn't cost too much; if it did, he would fight it; that he didn't want to spend too much to get the water right off. He also says that Melick told Cross he was ready to pay the money and Cross asked him to show the money, to which Melick said he didn't carry the money around with him, and Cross replied that he (Melick) never did bring the money down. At the time of this interview the complainant was still in possession of the property, using it as a summer picnic ground and making some profit from its occupation. She continued in possession after the interview, without any further communication on either side until November 3d, 1899, when the defendant served on her and her husband a formal written demand for possession of the premises described in the agreement, and threatened legal proceedings on failure to deliver possession. Complainant thereupon filed her bill (November 27th), setting up the agreement to give a warranty deed free from encumbrances, her possession under it, payment of part of the purchase-money and disbursements she had made in reliance on the agreement. The bill then sets out the defect of title by reason of the reserved water rights, the materiality of the reservation, the desirability of the property for manufacturing purposes, its practical uselessness for that purpose, by reason of the reservation, defendant's knowledge of the reservation several months before the expiration of the agreement, and his promise to obtain a surrender and complainant's continuance in possession in reliance on Cross' promise to procure the surrender. She further alleges that she had made a demand on Cross in September, 1899, and before filing the bill, that he give her a deed for the property or repay the purchase-money and disbursements and Cross' refusal and subsequent demand of possession. The special prayer of the bill is for a return of the purchase-money and disbursements with interest, or the delivery of a deed free from all reservation and encumbrances, upon payment of the amount still due under the contract, and in the meantime an injunction against the defendant's removal from the premises. By the bill the vendee thus asks either the return of the purchase-money and expenses, or the specific performance of the contract according to its terms. She does not, either by the

bill or at the hearing, ask or consent to specific performance with compensation for the defective title. The defendant, denying the materiality of the reservations of water rights or their essential bearing on the contract, now asks, by cross-bill, the specific performance of the contract, offering to give a warranty deed, if the court so direct, but insisting that the defect is not material to the contract, and that it is a case for specific performance, with compensation, for the reservation of water rights, to be deducted from the purchase-price. As will be observed, both parties have, by their pleadings and prayers for relief, now to some extent shifted the grounds which they respectively took while the transactions were in progress, according to the statement of their evidence above given upon this question. Complainant now seeks by her bill a rescission of the contract of sale and a return of the purchase-money paid, on account of an alleged defective title, while at the time of informing defendant of the defect, she requested indulgence for the further carrying out of the contract beyond the term fixed by the contract, without any intimation that the defect, even if it were not removed, would be insisted on as a reason for entirely abandoning the contract, nor does she offer any proof that any such intimation was given before the filing of the bill, or that any demand was made for the return of the purchase-money. The defendant, on the other hand, having, according to his own account, expressly and consistently insisted on an absolute termination of the contract from the date of its expiration up to the time of filing his answer, now seeks its enforcement as an existing contract, being willing, if it be adjudged equitable, to make compensation.

As to the reservation of water rights, it appears that on the property, near the Cutler line and about fifty feet distant therefrom, is located a spring, the rights to the waters of which are reserved to the owner of the Cutler property, with a right of entry to keep open the drains and pipes conveying the waters of this spring to ponds located on the adjoining property. The reservation was made in a deed from Mr. A. W. Cutler in 1866, when he conveyed the thirteen-acre tract to defendant's predecessor in title, and, until Melick's letter of June 22d, was never known to defendant, who had received a warranty deed from his

Melick *v.* Cross.

grantor. The easement reserved, being under the control of strangers, it is admitted that the property, if conveyed, must be subject to the easement, but it is contended (1) that the reservation is not material, and (2) that if so, it should be a subject for compensation, and is not a reason for rescinding the contract and returning the deposit. It is also claimed that there is a like reservation, in favor of the same owner, as to another spring supplying waters to the same ponds, but the location of this spring on defendant's property is disputed, and this objection to the title should not be sustained without further inquiry. The spring whose waters are admittedly reserved, and the lands covered by its connecting drains, include about two of the eighty-three lots into which the portion of the tract laid out in building lots is divided. This portion so laid out is between one-half and two-thirds of the whole tract, of which the two lots in question constitute a very small portion. The evidence does not establish, I think, that, on the part of either the vendee or vendor, the use by the vendee of the reserved waters was specially considered, on either side, as an inducement to the contract, nor was the reservation known to either party at the time of making the contract or the vendee's taking possession. The reservation, however, is of such a character that I am inclined to think that it created a substantial defect in the title, which gave the vendee, on its discovery, the option of abandoning the contract for that reason. But I think it is clear that the small part of the property affected by the easement does not prevent the enjoyment of the rest of its disposal in the manner contemplated by the parties at the making of the contract, and the defect is therefore one which may be waived as an objection to the title or to continuing the contract. If thus waived, the contract is not to be considered abandoned or put an end to, and the defect is a subject of compensation, as to which justice can be done by the court, if the parties fail to agree. Assuming that the objection is one which could have been equitably relied on by the vendee for abandoning the contract, had it been promptly made on its discovery, the question which arises on the proofs, under her present bill, is whether the objection to the title has not been waived by her continuance in possession and by her conduct and treatment of

the contract as existing since notice of the defect, which she received at least as early as the spring of 1899, and whether, in view of her possession and conduct, her relief in equity is not limited to specific performance, with compensation for the defect.

The principal disputed matter of fact, as to the conduct of the parties in reference to the contract previous to the filing of the bill, is as to the time and character of the first interview between Melick and Cross after Melick's letter of June 22d. Melick's present statement is that he sought the interview, because Cross did not answer his letter bringing the reservation to his attention, and that he went down to ask him what he was going to do about it. Cross, on the other hand, says that the meeting was accidental—at a public office—and that it was after his letter of July 12th declaring the contract terminated. They agree in the statement that the interview, whenever it occurred and however it occurred, was the first interview after Melick's letter of June 22d, and inasmuch as Melick, so far as can be judged from that letter, evidently did not then have in mind that the reservation was any basis of inquiry or demand upon Cross or that it created any obstacle to proceeding with the contract, I think that the importance he attached to it, in the first interview, did not result from changing his own view of it, after he wrote the letter, but that it was the probable, and, in his case, the natural, result of a notification, by Cross' letter of July 12th, that the contract was terminated. This notification, not being accompanied with an offer to return the deposit, necessarily implied a claim on Cross' part to retain the deposit forfeited, and such notice on Cross' part would naturally and probably have resulted in the counter-claim of defective title made by Melick. As to the time of the interview my conclusion is that Cross' statement is the more reliable. I reach the conclusion also that, as to the substance of the interview, Cross' statement is to be taken in preference to Melick's. The substantial point of difference as to the first interview is whether Cross then promised to get rid of the water right, and requested Melick to continue possession, or whether he refused to do anything about it, and denied Melick any rights under the agreement. Cross' pres-

ent statement, that he took the latter ground, is consistent with his letter of July 12th, and with the position which Melick and he both agree that he (Cross) took at the second-and only other interview. Melick's account depends alone upon his own present evidence, and in view of the fact that his credibility on matters connected with the water rights has been shaken by the evidence in this case, I am not willing to rely on his uncorroborated statement in preference to that of Mr. Cross.

Upon the whole case I conclude therefore, as to this disputed matter of fact, that Melick did not continue in possession on Cross' promise to remedy the defect in the title; that, as early as the latter part of July, Melick had notice that Cross claimed that the contract was terminated by limitation of time. It is admitted by Melick that he had this notice at the second interview early in September. There had not been, up to this latter date, nor was there then, any demand of possession by Cross, neither on Melick's part had there been any demand for a return of the deposit or any offer to deliver possession on repayment. Melick's continuance in possession, without such demand or offer, taking the view most favorable to the vendee, indicates that the vendee, on his part, was still continuing in possession, for the purpose of carrying out the contract and not of abandoning it, and with full notice that Cross, in carrying out the contract, did not expect or intend to free the property from the water reservation. Melick had notice also that subject to Cross' sale of the property to others, he (Melick) might, at any time, have the property under the terms of the contract. The fact that nothing was said at the second interview, upon either side, in reference to the delivery of possession, and that Melick's possession then continued for more than two months, indicates, I think, that Cross, on his part, permitted the continuance in possession in order that Melick might, if able to do so, carry out the contract, without regard to the water right, pending his own efforts to sell to other parties. Cross' notice to Melick in July, or at least in September, that the reservation would not be removed, also put Melick to his election either to treat the contract as abandoned, because of the defective title, and to offer to return possession, on payment of the deposit, or to continue in possession,

for the purpose of carrying out the contract, treating the defect as a matter for compensation, instead of abandonment. The continuance of possession, after the September interview, without any express notice to, or demand on, the vendor, changing the character of his possession from one affirming the contract to one abandoning it, left the possession, on his part, also a continuance of possession for the purpose of carrying out the contract. But although Melick, by this continuance in possession, for the purpose of carrying out the contract, asserted on his part, and permitted by Cross, may have waived the defect as an objection to carrying out the contract, there is nothing in the case to justify the conclusion that his continuance in possession after vendor declared the contract terminated waived his right to compensation for the defect in carrying out the contract.

As to a purchaser's waiver of the defect in title, the authorities settle the rule that a vendee may, on being informed of a defect in title, and either expressly or by his acts, waive the defect as a reason for abandoning the contract without, however, giving up his right to abatement or compensation for the defect, or he may, in like manner, waive the defect, both as an objection to the contract and as a matter of compensation. Taking possession after a notice of defect has been considered a waiver, both of the defect and of the right to compensation. *1 Sugd. Vend. & P. *398, *402; Burrell v. Brown, 1 Jac. & W. *169 (1820).* Where the vendee takes possession under the contract, he may object to the title for a defect subsequently ascertained, provided he abandons, or offers to abandon, possession, on account of the defect, as soon as he learned of it. *22 Am. & Eng. Encycl. L. 961.* But a continuance in possession, after such notice, for the purpose of completing the contract, may waive the right to object to the defect, although it may not destroy the right to compensation (*Calcraft v. Roebuck, 1 Ves. *226; Hughes v. Jones, 3 De G. F. & J. *307, *317 (1861); 1 Sugd. Vend. & P. *405, 406; 1 Dart Vend. (2d ed.) 402*); and going on with the negotiation and dealing after discovery of the true nature of the vendor's interest, is conduct inconsistent with an intention of abandoning the contract, and waives the defect as ground of

Melick *v.* Cross.

abandonment, although not of compensation.  *Pom. Spec. Perf.* (*2d ed.*) ¶ *451,* and cases cited, *note* (*3*).

Melick's conduct after discovery of the defect, in relation to the contract and the continuance of his rights under it, including the right to possession, must, as it seems to me, be taken to have clearly waived the objection to the vendor's title as a ground for abandoning the contract.  But it cannot be considered as waiving his right to compensation.  As to compensation, the evidence of waiver should be entirely clear, for this is a right which the court can adjust if the parties disagree, while it is otherwise as to the defective title.  Melick's request, admittedly made in both interviews, for information as to Cross' intention in regard to the reservation was an insistment on the objection, and while his continued possession, pending adjustment of the matter, may, with the circumstances of the case, be taken to waive the defect as ground of abandonment, it did not destroy the effect which the objection was entitled to have on his equities in finally carrying out the contract.  As to the vendee's rights on his bill, I conclude therefore that she is not entitled in equity either to a conveyance free of the easement or to a return of the purchase-money, but that she is entitled to a decree for specific performance, with compensation.  If the vendee declines to complete, with compensation, her bill must be dismissed.  This brings me to the second question, which is as to the vendor's rights, on his cross-bill, to affirmative relief by decree against the vendee for specific performance, with compensation.

If the vendor's standing in this case as an applicant for the special equitable relief of a specific performance were to be determined solely by his verbal and written claims and notices in reference to the contract, he could not be considered as entitled to the relief, because, on his part, he did not, before the filing of his answer and cross-bill, show himself ready, on his part, to perform the contract, as far as he could, or to do equity.  On the contrary, by his written notices and verbal declarations, he insisted on the termination of the agreement by the time limit, which carried with it a forfeiture of the deposit, and he made no offer either to return the deposit or to make compensation for the defective title.  But it appears that these notices and declara-

tions of the vendor were not, for several months, accompanied
with any demand for a possession of the premises, and that mean-
while the vendor gave the vendee, while remaining in possession,
the option of carrying out the contract if he desired to do so;
and that the notice to deliver possession was not given until over
four months from the expiration of the contract, and the vendee
had failed, up to that time, to indicate any intention either to
make any further payments on the contract or to abandon it.
These facts as to Cross' conduct, taken in connection with Mel-
ick's default in the payment of interest and taxes, and (judging
from his letter to Cross) his inability to raise money for the
payments, except by the sale of lots, leads me to the conclusion
that Cross was ready and willing at any time after the termina-
tion of the contract to carry out the sale, subject to the easement.
I think also that Melick, on his part, and notwithstanding the
notice, understood that the sale, subject to the easement, would
be carried out whenever he was ready on his part.  Cross' declara-
tion of his right to sell to another person, pending Melick's pos-
session, for the purpose of carrying out the contract, did not,
under these circumstances, have the effect, either upon his part
or that of Melick's, of changing what was in equity the real char-
acter of Melick's continued possession, after notice of the defect
in title, and after the expiration of the time fixed by the contract.
This possession was, on Melick's part, a continuance in possession
solely for the purpose of carrying out the contract, and, on Cross'
part, a permission of such continuance for this sole purpose.
Both vendor and vendee are, in my judgment, now obliged to
carry out, and entitled to insist upon, the equitable *status* which
has arisen from the possession of the premises, and their conduct
in connection with it, since the discovery of the defect in title
and up to the time of filing the bill.  The notice of the vendor
to deliver possession was not made for over four months, and in
view of the failure of the vendee to make any further payments,
or substantial offers of payments, was probably the only method
of bringing about a decision, by appeal to the courts or otherwise,
as to Melick's rights, either at law or in equity, to continue pos-
session.  It was apparently accepted as so designed, for the ven-
dee, not acquiescing in the abandonment of the contract, at once

Melick *v.* Cross.

filed his bill to protect his continued possession, and for strict specific performance, by conveyance of a clear title, or a return of his deposit, the latter being a demand which had not been made before filing the bill. Inasmuch, therefore, as it fairly appears, on the whole case, that as the vendor, on his part, although claiming that the contract had expired, was willing to waive any claim of expiration or forfeiture, and to carry out the sale, subject to the easement, and inasmuch as the conduct of the vendee in possession has made the easement a matter for compensation, rather than abandonment of the contract, I conclude that, on the vendor's cross-bill, specific performance, with compensation, should be decreed. Upon the question of the right of either party to treat the contract as rescinded or at an end, it should also be observed that in this contract the provisions as to the final payment and the delivery of the deed and securities for purchase-money were mutual and dependent stipulations, and therefore an actual tender and demand by either party was strictly necessary, in order to put the other in a default which would cut off his right to treat the agreement as still subsisting. *Pom. Spec. Perf.* (*2d ed.*) § *361.* In the absence of such tender on either side, and both parties being strictly in default, the contract remains in force, and either party may afterwards make a proper offer or tender and sue on the contract as a subsisting contract. *Ibid.* And while a vendee may undoubtedly rescind a contract without tender of performance on his part, where there is a total failure of the vendor's title, he cannot, in my judgment, ordinarily rescind without tender where the defect is partial and may be made the subject of compensation. In the present case neither party tendered himself ready to perform the contract according to its terms at the time fixed, and neither party has the right to proceed in equity on the basis of rescission. The contract must be considered as still subsisting, and the right of either party to a specific performance of the contract will not be affected merely by the failure to make the tender at the time fixed before the suit was commenced. *Ibid.; Freeman* v. *Bissell, 63 N. Y. 168* (*1875*).

At the hearing I was inclined to the view that the matter of

36

compensation would better be adjusted by directing a warranty deed to be delivered and leaving the compensation to be determined by a jury, if the vendee chose, in an action for breach of warranty. But I find on examination no precedents for this method, and it is contrary to the usual practice in equity, of finally settling all the questions in the suit; and as the question of compensation in equity may, perhaps, embrace other matters than those which would be in an action at law, the compensation should be settled here. The amount of compensation, when fixed in this court, is usually determined by an inquiry before a master, and as I am not now prepared to finally adjust the compensation upon the evidence taken at the hearing, I will hear counsel upon the question of ordering a reference, and at the same time hear them also upon the direction to be given to the master, if a reference is ordered. Counsel may also then give their views upon a question of the right to make a personal decree against the complainant for the payment of any balance of the purchase-money due on the contract. In the assignment of the contract to complainant she did not assume this obligation, but the cross-bill prays decree against Mrs. Melick for payment of the balance of the purchase-money. Her husband, the original purchaser, is not a party to the bill or cross-bill, and although the equitable jurisdiction to make decree against the purchaser for payment of the purchase-money is well settled (*Moore* v. *Baker, 49 Atl. Rep. 836* (*Vice-Chancellor Stevens, 1901*), and cases cited), the authorities, so far as I have examined them, seem to deny the right to a personal decree against the assignee of the purchaser who has not assumed the payment of the unpaid purchase-money.

The question was not argued at the hearing.